Fremont-Smith, Thayer, J.
In this case, the plaintiff, Valerie Keever Shaffer (“Shaffer”) seeks to recover damages from the defendant, Metropolitan Property & Casualty Insurance company (“Metropolitan”) for what she contends were Metropolitan’s unfair claims settlement practices in connection with a personal injuiy claim arising out of an automobile accident on November 23, 1999, when Shaffer’s car was rear-ended by Metropolitan’s insured, Diana Mignosa.[1]
As $25,000 was offered in settlement on September 26, 2001, but no further settlement offers were forthcoming until August 7, 2003, when the company offered the policy limit of $100,000, plaintiff brought suit against Metropolitan on December 4, 2002, alleging that the delay in doing so was in violation of G.L.c. 93A and G.L.c. 176D, §3. The case was tried without a jury during the period September 10 - September 14, 2006. In view of the complaint’s allegations that Metropolitan engaged in delaying tactics and a failure to make a reasonable settlement offer until August 2003, the Court has considered the following chronology of events and, based upon all of the credible evidence, the court finds and concludes as follows.
As a result of the accident, Shaffer was taken from the scene by ambulance to the Lahey clinic, where she complained of neck and back pain. X-rays of her spine were negative, and she was discharged home that day with a diagnosis of cervical strain. On January 14, 2000 Metropolitan received a letter from Shaffer’s lawyer requesting it pay her lost wages. On January 19, 2000 a representative from Metropolitan telephoned Shaffer’s lawyer advising him that he should submit a claim for Personal Injury Protection (“PIP”) benefits and indicated that Metropolitan would await further information from his office regarding Shaffer’s claim. A letter from Metropolitan to Shaffer’s lawyer dated February 9, 2000 requested information as to his client’s treatment.
At the end of March 2000, Shaffer’s lawyer wrote Metropolitan enclosing some of her medical records from the Lahey Clinic. The letter indicated he would forward additional medical records as they were received by his office. On May 1, 2000, June 5, 2000, August 11, 2000, November 11, 2000, and May 30, 2001 a representative from Metropolitan contacted Shaffer’s lawyer requesting updates as to her treatment and copies of all medical records, reports, and bills. On May 30, 2001 Shaffer’s lawyer advised Met *434 ropolitan that, as far as he knew, Shaffer was still treating and that he was awaiting a report.
In regard to her history of medical treatment, on December 23, 1999 she was examined by a neurologist, Dr. Irma Lessell, who felt that she had “a normal neurologic examination with the exception of increased reflexes at the knees.” On March 17, 2000 she was seen by Dr. Sparacio at the Lahey Clinic, who “felt she had a normal neurologic examination.” Her cervical spine had no fractures or dislocations. Similar results were obtained as a result of additional examinations of July 14, 2000, and July 16, 2000. On July 18, 2000 an MRI indicated a small disc formation at C 6, and she was referred to Dr. David, a neurosurgeon, who did not feel that it was “severe enough to warrant surgical intervention.” The Lahey Clinic report of Dr. Sparacio dated June 14,2001 reported that “she had some disc bulging with encroachment on the neural feranen at C 5-6 on the right side but it was not of a severity which would require surgery.”
On July 6,2001 Metropolitan received a letter dated July 2, 2001 from Shaffer’s lawyer which enclosed the report from Dr. Robert Sparacio dated June 14, 2001, a report of Dr. Richard M. Pertone dated April 13, 2001, records from Dr. Joanne Oh from the Lahey Pain Management Center, and reports of Joshua Berkowitz, M.D. In this letter, Shaffer’s lawyer asserted that plaintiff had been forced to voluntarily resign her position as a nurse at the Winchester Hospital and that she had been unable to return to work until October 2000. He further asserted that treatment was ongoing, that her doctors had told her she would not attain complete recovery, and that she would require future surgery. Although no supporting documentation was provided, and the Lahey doctors had actually concluded that surgery was not indicated,[2] Shaffer’s lawyer demanded that Metropolitan pay Shaffer the $100,000 policy limits.
Metropolitan immediately responded, acknowledging receipt of the settlement demand and advising that it would undertake an evaluation of the medical information provided. On July 26,2001 Metropolitan wrote again to inquire whether Shaffer was still treating and whether she was making a claim for a recent hospitalization which had been mentioned in an earlier correspondence.
Also on July 26, 2001 Metropolitan reminded him that, while it understood plaintiff was making a clam for lost wages, no lost wage documentation had been submitted. It requested that Shaffer sign a wage authorization so that it could request this information directly from Shaffer’s employer, Winchester Hospital. Metropolitan received the wage authorization form on August 7, 2001, and was subsequently informed by Winchester Hospital that plaintiff had not been employed there at the time of the accident.[3] Nevertheless, on August 28, 2001 Shaffer’s lawyer sent Metropolitan a letter demanding it pay the policy limit of $100,000 to settle her claim, and asserted there had been an unreasonable and unjustified delay in resolving Shaffer’s claim in violation of M.G.L. Chapters 176D and 93A.
As a result, on September 10, 2001 Metropolitan prepared a claim evaluation based on the information they had been provided to date, which took into account the medical bills and reports received by Metropolitan. The evaluation used a computer program which is widely used in the insurance industry to formulate settlement offers, known as “Colossas.”This provided an evaluation of $22,500. A second “manual evaluation” was also done, resulting in a settlement range of $25,000 to $38,500. On September 14, 2001 Metropolitan wrote to Shaffer’s lawyer in response to his written demand and offered $25,000 to settle Shaffer’s claim.[4] The letter explained that it had received medical records only through September 2000 and bills through December 2000, and explained that there was no documentation to support her lost wages claim. The letter also pointed out that Shaffer had an extensive prior history of concussion, a prior history of anxiety and depression (for which she continued to be on medication), and that one week prior to the accident with Mignosa, Shaffer had injured her neck and back at work. It also noted that a CT scan of the head and a brain MRI conducted after the accident had yielded normal results.
On October 18, 2001 Metropolitan, being informed of plaintiffs rejection of its offer, called plaintiffs counsel who indicated he would come off the policy limit of $100,000, but just a little. The adjuster concluded from this that a settlement offer even at the high end of his authority ($38,500) would not be entertained by plaintiff so he did not increase Metropolitan’s offer.
On October 18, 2001, Shaffer filed suit against Mignosa. The next day, Shaffer’s lawyer called Metropolitan to say he had engaged a neurologist to evaluate his client and to hold off answering the complaint until he received this report.
On October 30, 2001 Metropolitan referred the case internally to its litigation department. In the course of discovery, Metropolitan learned that in the week prior to the accident with Mignosa, Shaffer injured her neck and back while moving a patient, that on July 16, 2000, while lying in bed, Shaffer felt something in her neck “pop,” that on January 21, 2001 Shaffer slipped on a wet floor and fell down a flight of stairs suffering injury to her hip, right fifth toe, and buttock, that on June 5, 2001 Shatter injured her back, right eye, right ear and both of her shoulders when she was “yanked” by a combative patient at work, that on July 26, 2001 Shaffer struck a pole while driving as a result of which she was boarded, collared and transferred to Winchester Hospital, where she was treated for neck pain, right leg pain, headaches, and nausea, and that, in August 2001, Shaffer reported to her doctors at the Winches *435 ter Hospital that her neck pain had improved and that on a scale of one to ten, her neck pain was a one or a two.
In March 2002 Shaffer was examined at the request of Shaffer’s counsel by Dr. Shapur A. Ameri, who is board-certified in neurological surgery. According to his report, Shaffer told him that “she had been seen by multiple neurosurgeons who reportedly have recommended that she have surgery done.”[5] On May 16, 2002 Shaffer underwent anterior cervical discectomy with fusion at the Boston Medical Center.
In his October 1, 2002 report to Shaffer’s counsel, Dr. Ameri wrote that, in his opinion, “she will have permanent/partial limitations subsequent to the surgery performed on May 16, 2000 ... I believe with a reasonable degree of medical certainly that Ms. Shaffer’s cervical herniated disc and subsequent anterior cervical discectomy was causally related to the automobile accident of November 1999.” A copy of this letter was provided to Metropolitan on October 7, 2002.
On receipt of this letter, which was Metropolitan’s first and only notice that Shaffer had medical substantiation for her claim that the accident had or would necessitate surgery, Metropolitan decided to follow its usual practice to have such a claim submitted for an independent medical review (“IMR”).
As a result, on May 13, 2003 a board-certified neurosurgeon at the Lahey Clinic, Dr. Peter Dempsey, completed an independent medical review (“IMR”) of Shaffer’s medical file. He authored a preliminary report which detailed his findings based upon his review of the MRI studies performed on 12/3/99, 4/14/01 and 3/14/02. It was Dempsey’s opinion that, while the films did show some disc extrusion at C 3-4, C 4-5 and C 5-6 levels, none of the disc material was causing any distortion of the spinal cord and that the films did not reveal any frank herniations. He requested, before he could render an opinion, an opportunity to review additional medical records.
In his final IMR report, dated August 5, 2003, he reviewed Shaffer’s entire record of treatment at the Lahey Clinic before rendering his final conclusions as to the causation of her injuries and surgery. He concluded that, as a result of the November 23, 1999 motor vehicle accident, Shaffer did suffer a strain injury to her cervical spine, but that if Shaffer had suffered a neurologic injury to her cervical spine in the November 23, 1999 accident, she would have had evidence of motor or sensory deficit or a reflex asymmetry, which was lacking. He further concluded that Shaffer did not suffer a significant structural injury to the cervical spine as a result of the car accident, as there was no evidence of any fracture on the x-rays taken at the time of the injury. In his opinion, it could not be stated, to a reasonable degree of medical certainty, when the disc changes on the MRI came about, but that such changes were consistent with the normal degenerative process of the cervical spine. Moreover, in Dempsey’s opinion, had Shaffer’s symptoms been clearly related to the MRI findings, then her pain would have improved with the surgery, which did not happen. He concluded that, given the length of time between the injury and the surgery, and given the lack of any significant indication of neurologic injury in the time period which had ensued since the accident, the surgery was most likely not related to the accident in November of 1999, but was rather related to a chronic degenerative process of the cervical spine.
In spite of Dr. Dempsey’s conclusion in his August 5, 2003 report that plaintiffs cervical disk problem and resultant surgery could not be shown to have been caused by the accident, Metropolitan offered the policy limit of $100,000 to Shaffer on August 7, 2003.
As noted, Shaffer had brought suit on December 4, 2002, alleging that Metropolitan had acted in violation of G.L.c. 176D, §3 by:
(1) Failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies;
(2) Refusing to pay her claim without conducting a reasonable investigation based upon all available information;
(3) Failing to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear;
(4) Compelling the insured to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insured;
(5) Attempting to settle a claim for less than the amount to which a reasonable man would have believed he was entitled; and
(6) Failing to provide promptly a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement.
It is true that, after plaintiff rejected Metropolitan’s offer of $25,000 on September 26, 2001, Metropolitan never offered any additional amounts until August 7, 2003 when Metropolitan finally offered the full policy limit ($100,000).
At trial, plaintiff took the position that, it was an unfair insurance practice not to increase its offer from the initial $25,000 to the top of its range of its settlement authority of $38,500, even before Dr. Ameri’s letter (which first gave medical substantiation to the cause of her surgical claim) became available in October 2002. While plaintiff admits that some medical reports were missing and not provided by plaintiffs counsel until 2003, plaintiff contended that defendant could have subpoenaed the missing medical records anytime after suit was filed against Mignosain Decern *436 ber 2001, and that defendant should have relied on Shaffer’s deposition (taken in August 2002) to determine her medical and wage history, and to fill in any gaps.
The Court concludes, however, that it was reasonable for the company not to increase its $25,000 offer in the circumstances. At the time of the accident, she was sent home after negative x-rays of the spine and with a diagnosis of cervical sprain. As noted above, the Lahey Clinic doctors later concluded that her disc bulge indicated by the MRI did not justify surgery. The Winchester Hospital denied that she had worked there at the time of the accident, or that she had lost any wages as a result. Plaintiff, moreover, had been the victim in a number of spousal assaults and other accidents (both motor vehicle and otherwise) before and after the accident. No case has been cited for the proposition that an insurer must, under such circumstances, offer the highest figure in a range of settlement authorization, where the initial offer was, as the Court finds, reasonable under the circumstances.
On the contrary, it is clear that where, as here, liability is clear but there is a good faith dispute as to the extent of the damages, an insurer, while it is obligated to make what it believes to be a reasonable offer, is not obligated to immediately proffer its final or best offer. As noted in Bobick v. United States Fidelity and Guarantee Trust, 439 Mass. 652 (2003), at 662 citing Forcucci v. United States Fid. & Guar. Co., 11 F.3d 1, 2 (1st Cir. 1993):
Negotiating a settlement, particularly when the damages are unliquidated is, to an extent, a legitimate bargaining process. The statute [G.L.c. 176D, §3(9)] does not call for [a] defendant’s final offer, but only one within the scope of reasonableness. Experienced negotiators do not make their final offer first off, and experienced negotiators do not expect it, or take seriously a representation that it is.
Prior to its receipt of Dr. Ameri’s report on October 7, 2002, there was no call for Metropolitan to increase its $25,000 offer, which the Court finds to have been reasonable in the circumstances then known to it, to the authorized limit of $38,500.
It is true that one of the insurer’s claims adjusters testified at trial that he was deterred from sweetening the $25,000 offer because of plaintiffs counsel’s adamant refusal to accept less than close to the policy limits.[6] In Bobick, supra, the Court held at 662-63, that the distance or “gap” between the parties’ settlement positions in that case did not justify an insurer’s failure to make a reasonable settlement offer, even if the adjuster was convinced that such an offer would not be accepted. The Court said, at 662: “Even excessive demands on the part of a claimant, however, do not relieve an insurer of its statutory duty to extend a prompt and equitable offer of settlement once liability and damages are reasonably clear.” This, however, is not the case here, where the “gap” between the parties’ positions only deterred the adjuster from sweetening what was, the Court finds, an already reasonable offer in view of the fact that, unlike in Bobick, liability and damages were not here “reasonably clear.”
A more serious question is whether defendant unreasonably delayed paying the policy limits after its receipt of Dr. Ameri’s letter (October 7, 2002) until the time of the settlement offer ($100,000 on August 3, 2003).
After the company’s receipt of Dr. Ameri’s letter on October 7,2002, it had its first notice that plaintiff had medical substantiation for her claim that, as a result of the accident, she had suffered a ruptured disc which required surgery. But, in view of the Lahey Clinic’s doctors earlier having concluded otherwise,[7] and the fact that Dr. Ameri’s opinion was based, at least in part, on a medical history received from the plaintiff which was incorrect,[8] it was not unreasonable for defendant to follow its usual practice of procuring an independent medical review (“IMR”) of all the medical records of the plaintiff, which were still not available,[9] before reevaluating its position.
After most of the records were located and provided, the file was sent for an independent medical review to Dr. Peter Dempsey, a board-certified neurosurgeon at the Lahey Clinic. In his initial report dated May 19, 2003, he concluded that “it was impossible for me to state with any medical certainty what her injuries may have been” from the accident due to the absence of critical medical records.
After the additional records were procured, Dr. Dempsey made a final report on August 5, 2003. In this “IMR” he noted that, following the accident, tests had been negative and she had been “discharged home with a diagnosis of cervical strain.” He further noted that on November 23, 1999, she was examined by Dr. Alain Pollack who found no fractures and that tests of her spine were negative, that a CT-scan of her head on November 30, 1999 was normal, that on December 23, 1999, she was examined by a neurologist, Dr. Irma Lessell, who felt that she had “a normal neurologic examination with the exception of increased reflexes at the knees,” that on March 17, 2000 she was seen by Dr. Sparacio at the Lahey Clinic, who felt she had a “normal neurologic examination”; that similar results were obtained as a result of additional tests on March 17, 2000 July 14, 2000 and July 16, 2000, and that on July 18, 2000, an MRI indicated a small disc formation at C 6, which Dr. David, a neurosurgeon, felt was not severe enough to warrant surgical intervention.
Based on this extensive medical history, Dr. Dempsey concluded that, in his opinion, the plaintiff “did not sustain neurologic injury as a result of the accident as there was no evidence of sensory deficit, or reflex asymmetry.” He concluded that her disc changes “cannot be stated with any degree of medical certainty” to have resulted from the accident, but were “consistent with the normal degenerative process ...” *437 He further concluded that she “sustained a strain injury to the cervical spine as a result of the accident,” but that, in view of the “lack of significant structural injury or neurologic injury in the weeks to months after the accident, it is my opinion that the surgery is most likely not related to the accident of November of 1999, but rather related to a chronic degenerative process of the cervical spine.”
The day following defendant’s receipt of this report, Metropolitan increased its settlement offer to the policy limits of $100,000.
At trial, much of the testimony was directed to the above-noted delay between the defendant’s receipt of Dr. Ameri’s letter of October 7, 2002 and the August 2003 offer of settlement. Plaintiff would attribute this delay to deliberate foot-dragging, and argues that Metropolitan’s insistence on additional records and an IME was a “cover” for deliberate procrastination.
The Court concludes otherwise. As indicated above, the medical findings as to the severity of her injuries from the accident were at best ambiguous, and raised legitimate doubt both as to their severity and their causation. This remained true even after receipt of Dr. Ameri’s opinion, in light of Dr. Dempsey’s and the earlier Lahey Clinic doctors’ opinions to the contrary. In the Court’s judgment, the likelihood of a recovery in excess of $25,000 was never “reasonably clear” so as to mandate a more substantial offer, particularly in light of Dr. Dempsey’s final and unequivocal report of August 5, 2003 to the effect that the causation for serious injury was not established. See, in this regard, Bobick v. United States Fidelity and Guarantee Trust, supra; Van Dyke v. St Paul Fire and Marine Ins. Co., 388 Mass 671, 677 (1983) (independent medical advice that liability is not reasonably dear justifies refusal to settle), and Clegg v. Butler, 424 Mass. 413 (1997) at 421 (duty to settle does not arise until liability has become reasonably clear with respect to both fault and to damages).
Plaintiff contended at trial that Metropolitan’s ultimate capitulation and payment of the $100,000 policy limits itself evidences Metropolitan’s bad faith in having previously refused to offer that amount. The Court disagrees. Faced with the expense of a trial and the unpredictability of what a jury might award, as well as the prospect it might be sued by the insured if it refused to offer the policy limits and an award exceeding the policy limits ensued, the ultimate payment of those limits was, the Court finds, a reasonable business policy decision, but was not, in the circumstances, an indication that the company believed its prior settlement offer to have been unreasonable.

JUDGMENT

For all of the above reasons, the Court rules that Metropolitan committed no violation of G.L.c. 93A and G.L.c. 176D and ORDERS that judgment be entered for the defendant.

Metropolitan had issued to Mignosa a standard Massachusetts automobile insurance policy with a limit of $100,000 per person.

See above.

The hospital informed Metropolitan she was not employed there until November 2000, a year after the accident.

G.L.c. 93A, §9(3) provides that the recipient of a c. 93A demand letter must make a reasonable “written tender of settlement” within 30 days.

As noted above, Doctors Sparacio and David both had opined that the disc bulging at C 3-4 and C 5-6 was not severe enough to warrant surgical intervention, and there is no record that any other doctor recommended surgery.

Plaintiffs’ counsel told him that plaintiff might come off the demand for the policy limits, but “just a little.”

See fn.5, p. 6.

Pages 5-6, supra.

It turned out that several of the MRI records which were awaited had been removed from the possession of her medical providers by Shaffer and were not located until some time in 2003, when they were retrieved by her counsel from her home.